UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------
DR. LAWRENCE GLASS,

                Plaintiff,                        04 CIV 8723 (CLB)

vs.

NEW YORK STATE OFFICE
OF MENTAL EHALTH, MICHAEL
HILL and HAL SMITH, sued in their
individual capacities,

                Defendants.
------------------------------------------------------------

## <u>PLAINTIFF'S COUNTER-STATEMENT OF FACTS</u>

      Now comes plaintiff and as and for his statement of disputed material facts states as follows:

A.  <u>BACKGROUND</u>

1.  Plaintiff was hired to the sole psychiatrist line at Sullivan Correctional Facility on the basis of a phone interview with Kathy Lee, an administrator at Central New York Psychiatric Center in Marcy, New York and Michael Hill, chief of the Mental Health Unit at Sullivan Correctional Facility. <u>See</u>, Glass at 12, Exhibit 1 to Sussman Affirmation for e-mail from Kathy Lee, Sawyer Deposition at 11, Hill at 34.

2.  An e-mail stating that Glass was interviewed at Sullivan by Hill is inaccurate. <u>See</u>, Exhibit 2 to Sussman Affirmation.

3  Glass and Hill both worked at Mid-Hudson Psychiatric Facility, overlapping for 12 years in the 80's and 90's. <u>See</u>, Hill at 12.

4.  After Glass was hired, Hill told Depew and Ed Rudder, a psychologist hired in December to

work at Eastern Correctional Facility [ECF], that he and plaintiff were personal friends.  See,
Depew at 11 and Rudder at 12.  At the same time, Hill had had no contact with Glass for about
ten years. See, Hill at 40.

5.  Hill also told Rudder that Glass would provide a long term solution for the chaotic psychiatric
coverage which had characterized ECF. See, Rudder at 18.

6.  Within the prior year, SCF had employed three other psychiatrists. See, Depew at 10.

7.  In light of his seventeen years of service as a state psychiatrist at the Mid-Hudson Psychiatric
Center, plaintiff asked Lee whether he could avoid serving a probationary period.  She declined
and told him such a period was mandatory. See, Glass at 13.

8.  Defendant Michael  Hill, plaintiff's supervisor at the Sullivan Correctional Facility [SCF].
[Id. at 11], Hill is neither a psychiatrist nor a medical doctor.

9.  Hill commenced working at SCF in January 2004. See, Hill at 24.

10.  Hill supervised nurses, psychiatrists, Depew, the nurse administrator, Banyon, the physician
assistant [who could also prescribe medication, psychologists, social workers and clerical staff.
See, Hill at 30.

11.  Within one month of his arrival at SCF, Hill was calling Depew "mommy" and she was
calling him "daddy." See, Depew at 81-82.

12.  At SCF, plaintiff saw maximum security inmates with mental health issues from the
intermediate care program and the Special Housing Unit [SHU] and, after six weeks, spent one
day/week at ECF. [Id. at 10-11].

13.  Rudder was then the only full-time mental health unit staff member at ECF. See, Rudder at
6.

14.  Before Glass started working at ECF, OMH had to pay psychiatrists extra to cover this

facility. <u>See</u>, Rudder at 14-15.

15.  After the last paid psychiatrist left ECF, there was a several month gap before Dr. Glass was assigned to provide services for ECF inmates. <u>Id.</u> at 15.

16.  Plaintiff participated in team meetings with intermediate care providers and made rounds of SHU patients with Cesar Loarca [Loarca]. <u>See</u>, Glass at 11.

17.   During plaintiff's employment,  Dr. Inaganti, regional supervising psychiatrist assigned to Fishkill Correctional Facility, <u>see</u>, Rudder at 54, wrote a performance evaluation on July 13. Before writing this evaluation, Dr. Inaganti had *never* interacted with plaintiff and plaintiff met him for the first time when given the evaluation.  <u>See</u>, Glass at 12, 87. [1]

18.  Smith claimed that he learned that Inaganti had trouble making contact with Glass concerning this evaluation. <u>See</u>, Smith at 27.  Hill testified at deposition that Inaganti had expressed this concern about Glass. <u>See</u>, Hill at 47.

19.  Plaintiff is totally unaware of any such problem. S<u>ee</u>, Glass Affidavit.

20.  Before writing his evaluation, Inaganti had no conversation with Rudder about Glass. <u>See</u>, Rudder at 54.

21.  In this evaluation, the only one plaintiff received, the following is noted about Dr. Glass: "sees his assigned patients on a timely basis", "uses his time effectively", "makes sound clinical decisions", "gets along well with OMH and DOC's staff"; "is friendly and cooperative", "follows the policies and procedures of CNYPC".  <u>See</u>, Exhibit 9 to Sussman Affirmation. [2]

---

1  "This form is typically completed by the regional psychiatric supervisor who has contact with the psychiatrist involved.." <u>See</u>, Sawyer Deposition at 18-19.

2  According to Smith, he saw this evaluation before terminating Glass and viewed it as "benign", meaning it was not positive or negative. <u>See</u>, Smith at 28.  Smith had "no clue" whether Dr. Inaganti ever spoke with Glass before completing this evaluation. <u>Id.</u> at 29.  Smith also did not know whether before doing the evaluation, Dr. Inaganti reviewed any of Glass' charts, which he certainly should have done. <u>Id.</u> at 29-30.

22.  During plaintiff's employment, Hill never provided him any counseling memorandum or expressed any concern about his job performance to him. <u>Id.</u> at 195.

23.   No superior ever told plaintiff that part of his job was to report mistreatment of inmate/ patients. <u>Id.</u> at 14.

24.  Plaintiff did not engage in psychotherapy with inmates, but, rather prescribed medications and charted how the patients reacted to that medication. <u>Id.</u> at 16-17.

25.  Unit secretaries were responsible for tracking appointments and advising the psychiatrist when a prescription needed to be re-filled, using a computer program called ACCESS. <u>See,</u> Rudder at 25.

26.  After Mary Kahn retired as secretary at ECF in late July 2004, Rudder became responsible for tracking such information; these were responsibilities he did not want and it felt like forever before a new secretary assumed these duties. <u>Id.</u> at 29.

27.  At SCF, the unit secretary, Kathy Rampe, pulled patient charts and mental health staff, including plaintiff, took necessary charts and returned them to a long table at the end of the day. Rampe would then re-file the charts. <u>See,</u> Glass at 21.

28.  At ECF, plaintiff commenced seeing inmates on June 3, 2004. <u>See,</u> Exhibit 3 to Sussman Affirmation.

29.  Due to plaintiff's recent hip replacement surgery, Rudder was tasked with bringing patient charts from the administrative offices on the third floor where they were kept to the area on the first floor where plaintiff would see inmates. <u>See,</u> Glass at 21-2, 29, Rudder at 23-24.

30.  Rudder did not particularly want to perform this function and suggested ordering a cart which would allow Glass to transport files. <u>See,</u> Exhibit 4 to Sussman Affirmation.

31.  As Rudder was reluctant to cooperate and bring plaintiff needed charts, plaintiff began

seeing patients in an area distant from the nursing station where the order book was kept; when plaintiff realized he was making minor errors in writing orders, he decided he needed to again see patients in an area closer to the nursing station. Id. at 22-23.

32.   In this new area, Glass arranged to leave relevant ECF inmate charts in a locked drawer at the nurses' station. Id. at 24-25.

33.   By late June, Glass had set up a functional system at ECF, knew the inmates and their needs and had established a working relationship with Rudder. Id. at 30-31, See, Exhibit 5 to Sussman Affirmation.  Indeed, Rudder liked Glass and developed a professional working relationship with him. See, Rudder at 58.

34.   To order medication for a patient, Glass wrote orders in the patient chart and a separate script in triplicate.  The nurse then faxed the order to the pharmacy at Ulster Correctional Facility and the medication was sent in a tote bag to ECF.  When a chart lacked a copy of the script, Rudder could not attribute this to Glass as the unit secretary may have failed to include in the chart. See, Rudder at 38-41.

35.   In late June 2004, the ECF medical unit coordinated a meeting with members of the mental health unit, including Glass and Depew.  Rudder recalled no "agenda" which Mike Hill set for this meting. See, Rudder at 49-52.

36.   At SCF, Glass' access to all the SHU patients was limited to one hour/week. Id. at 41.

37.   Glass believed that many of the inmates in SHU, detained in their cells 23 hours/day, needed his services.  He asked Hill and Shelly Depew, Hill's assistant, to intervene with the Department of Correctional Services to get him additional access to these men.  See, Glass at 40-41.

   B.  ESCHELL ASHCROFT - JULY-EARLY AUGUST 2004

38.  During the summer 2004, plaintiff spoke at staff meetings several times about the mistreatment of  Eschell Ashcroft. Id. at 32.

39.  At these meetings, plaintiff explained that Ashcroft was not an Axis 1 patient and should not be sent to Central New York or, later, gassed. Id. at 32-33.

40.  Ashcroft was an inmate with major behavioral problems who was being manipulative, not somebody who was out of control because he was emotionally disturbed. Id. at 35, 60, 72-74.

41.  For this reason, he was placed in SHU at SCF and, Glass felt, should have remained in that unit. See, Glass Affidavit. [1]

42.  During the few days he was in the mental health unit before being transferred on July 15, 2004 to Marcy, Ashcroft was not receiving any psychotropic medications. Id. at 77.

43.  His case was discussed by the SCF treatment team, which included nurse practitioner Diane Banyon, Loarca, Depew, Hill and several nurses for several months before Ashcroft was transferred to a mental health unit cell. Id. at 37, 165-67.  On at least ten such occasions, Glass expressed the view that Ashcroft was manipulative, a behavioral, but not a psychiatric, problem, Id. at 167, who needed to be maintained in SHU, not transferred, as the inmate wanted, to Mental Health. Id. at 168-171.

44.  By this time, the treatment team had not devised a treatment plan for Ashcroft. Id. at 38.

45.  In July 2004, Hill wanted to send Ashcroft to Marcy, the state's premier psychiatric facility for inmates. Id. at 51.

46. To do this, Hill needed Glass to sign off on the necessity of this transfer, a so-called 2 PC form. Id. at 51, Loarca at 12.

47. To justify sending an inmate to Marcy, Glass needed to conclude that he suffered from an

---

1   SHU is a disciplinary unit run by DOCS. See, Hill at 27.

Axis 1 psychiatric disorder or mental illness.

48.  Glass refused and, in fact, did not report to work on the day Hill wanted him to sign off on this transfer and told Hill he hoped he could find someone else to sign the 2 PC. Id. at 44, 63.

49.  Hill was not happy that Glass was unwilling to the two-PC papers on Ashcroft. Id. at 202.

50.  On July 13, 2004, Hill wrote Dr. Lee, the clinical director at CNYPC, [3] that he "having some difficulties with Dr. Glass...He was supposed to complete his part of a 2 PC yesterday [for an inmate transferring to CNYPC tomorrow, 7/14).  When we determined that he had not completed his portion of the 2 PC, I called him at home to verify that the work had not been done.  He stated that he did not do it.  I asked him to report to Sullivan before coming to Eastern to complete **his assigned task**.  He reluctantly said that he would come in...as of this writing [12:25:13 p.m. on 7/13/04] he has not come into Sullivan and not yet reported to Eastern [not due there until 1 P.M.]..." [emphasis added]. See, Exhibit 6 to Sussman Affirmation. [4]

51.  In reply to this e-mail, Dr. Lee wrote back that she "had the feeling the day he was here for orientation" that plaintiff would not work out and that "my only surprise is that it took so long."

52.  Lee then reported that she had another doctor who might be interested in replacing Glass, but that this was uncertain. See, Exhibit 7 to Sussman Affirmation.

53.  By 12:55 p.m. on July 13, 2004, Glass arrived at SCF.  Hill e-mailed Lee and Inaganti that he was filling out the 2 PC; at 2:24 pm, the same day, Hill reported that Glass is "very adolescent in terms of his views of things" and then added, "we will continue to work with Dr. Glass in

---

3  See, Sawyer Deposition at 15-16.

4  At this time, Dr. Sawyer was Hill's direct supervisor.  See, Sawyer Deposition at 11-12. Sawyer could not recall Hill reporting his conflict with Glass concerning the 2 PC for Ashcroft, but testified that his subordinate "may have" shared it with him. Id. at 14.  Later in his deposition, when asked what he remembered about Hill's reporting concerning conflicts with Glass, Sawyer testified, "I recall generally that there was a problem with a 2 PC." Id. at 24.

hopes that he works with us." <u>See</u>, Exhibit 8 to Sussman Affirmation (emphasis added).

54.  By adolescent, Hill meant that Glass was a little bit of a "maverick". <u>See</u>, Hill at 127.

55.  Though Hill knew that Glass opposed this transfer because he believed it was a mis-use of the State's psychiatric system and a distortion of Ashcroft's issues, <u>Id.</u> at 44, 168, he called Glass at home and told him "You need to get in here and you need to do this 2 PC." <u>Id.</u> at 64.

56.  Facility directors are not supposed to pressure psychiatrists to sign off on 2 PC commitment forms. <u>See</u>, Smith at 91.

57.  When asked why, Smith explained, "Because the two physicians who sign the commitment papers are operating under their license to attest in their clinical judgment that the individual fits and criteria for commitment...it is not anyone else's place to question the legal, medical judgment of those independent practitioners." <u>See</u>, Smith at 92.

58.  Hill knew he had no authority to order Glass to sign the 2 PC, but claims he "encouraged" plaintiff to do so. <u>See</u>, Hill at 119-20.

59.  Glass told Hill that Ashcroft should have remained in SHU, that he had already been sent to Central New York, that they found there was little or nothing they could do for him and bringing him down to the mental health unit at SCF was a mistake. <u>Id.</u> at 48.

60.  Hill falsely claims that he and Glass had no disagreement about the proper treatment of Ashcroft. <u>See</u>, Hill at 80-81

61.  In fact, Hill told Glass that he had accepted Ashcroft as a mental health unit patient because the SCF Deputy of Security, Decker, had decided that the correction officers assigned to the SHU needed a break from him. <u>See</u>, Glass at 53, 167-68..

62.  Glass replied that these officers had bid SHU, that dealing with Ashcroft was part of their job and that this was not an appropriate reason to assign him a scarce mental health unit cell.

Id.

63.  Other members of the treatment team were afraid to speak up, whether Hill was present at

treatment team meetings or not, though some allowed to Glass privately that they agreed with his

analysis. Id. at 50, 59.

64.  On or about July 27, 2004, after about two weeks at Central NY, Ashcroft was returned to

the mental health unit at SCF. Id. at 82. [5]

65.  Plaintiff protested Ashcroft's return to the mental health unit and asked Hill, "Why is he

back here?  Why is he back at these cells?" Id. at 84, 110.

66.  Hill admitted that Glass opposed the appropriateness of Ashcroft's return to the unit. See,

Hill at 83-84.

67.  Once returned to MHU, Ashcroft desecrated his cell, spreading feces around it.

See, Loarca at 18.

68.  When asked why he did this, Ashcroft told Loarca, "When he gets treated like an animal, he

would react like an animal." Id.

69.  On Friday, July 30, 2004, Ashcroft was to have been gassed. Id. at 88, 90.

70.  On Friday, plaintiff spoke out against this at a treatment team meeting, indicating it was not

appropriate or necessary. See, Glass at 153.

71.  Plaintiff was not advised why this did not happen, but it did not. Id. at 90-91.

72.  On Monday morning, at a treatment team, plaintiff stated that gassing Ashcroft was

ridiculous, that first of all Ashcroft should not have been in Mental Health, that we are gassing a

135 pound blind, black drug dealer and that it was inappropriate and excessive. Id. at 154.

Plaintiff also stated that he could talk Ashcroft out of his cell and have him walk back with

---

5  The median stay for an inmate at CNYPC is forty five days. See, Sawyer Deposition at 21.

plaintiff to SHU. Id. at 88, 92-93.

73.  Glass stated that the gas extraction was unjustified even though Ashcroft might have made a

noose; many times before, while in SHU, as a means of manipulating corrections officers,

Ashcroft claimed to be suicidal. Id. at 100-01, 105.

74.  Hill was not at the August 2 morning meeting.  However, after the meeting, Depew and

Loarca told him that plaintiff had spoken out against the agency procedures and policies and

against the way Hill had supported what plaintiff believed was the mistreatment of the inmate.

See, Hill at 162-64.

75.  After this August 2 treatment team meeting, Hill called Glass into his office and expressed

great anger at plaintiff for voicing his opinion that other, less excessive means than gassing could

have extricated Ashcroft from his cell. See, Glass at 96.

76.  As Glass explained, "He was already bent on going this route.  He was mad at me for giving

my opinion in from of the entire staff, he made that known in no uncertain terms, and I left then

went out into the hallway and watched the process again." Id.

77.  Thereafter, the gassing commenced; according to Hill, "four gas applications were applied

before the officers determined that the gas was inert...other canisters from the batch were also

checked and found to be inert as well...DOCS is attempting to get a new canister from

Woodburne.  They have one shot left to administer (per directive). See, Ex. 10 to Sussman

Affirmation.

77.  Apprised of the gas extraction, Donald Sawyer, the Director of Operations at CNYPC, See,

Sawyer deposition at 7,  asked Hill, "what's the plan after he's removed?  Does not sound

appropriate for readmission here." Id.  [6]

_____

6 At his deposition, Sawyer claimed that he was not being kept apprised of the Ashcroft
extraction as it occurred.  See, Sawyer deposition at 9-10.  This is contrary to the documentary

78.  Hill agreed with Sawyer in an e-mail written at 11:18 a.m. which reported that Ashcroft had given up without a fight, been injected with Haldol/Atavan and was being watched 1:1. Id.

79.  Glass had failed to provide an order for the administration of Haldol.  See, Hill at 88-89.

80.  Hill claimed that Glass refused because he wanted nothing to do with Ashcroft. Id.

81.  However, Glass refused to do this because he believed the agency practices were improper and that through the intervention of a skilled psychiatrist, Ashcroft could have been talked out of his behavior. See, Glass at 88, 92-93.

82.  After the extraction, Dr. Lee agreed that Ashcroft was not a good candidate for CNYPC, though her e-mail does not acknowledge that he had just spent two weeks there. See, Exhibit 11 to Sussman Affirmation.

83.  As in this situation, when Glass observed abuse in prior work environments, he complained to supervisors or others in supervisory positions.  See, Glass at 113-16.  He did not report alleged abuses at other facilities where he worked to the press. Id. at 116.

   C.  EVENTS OF AUGUST 3, 2004

84.  In the morning treatment meeting on August 3, 2004, Glass stated that he felt the gassing was ridiculous, particularly since, as a consequence, Ashcroft had not even been moved to SHU, but, rather to another mental health unit cell. Id. at 160.

85.  On August 3, 2004, Glass accidentally entered SCF with a cell phone. Id. at 119.

86.  He first realized this right before the scheduled 11:30 a.m. conference call with Hill and others, including Sharon Barbosa from Central NY, concerning Ashcroft. Id. at 120-21.

---

record as recited above.  When confronted with the documents showing his own contemporaneous involvement in the gassing event, Sawyer still could not recall the matter.  He did opine that he must then have had "additional knowledge of the case...that led me to believe that this particular inmate patient had primarily behavioral problems that...typically...are best treated within a correctional setting." Id. at 20.

87.  In Depew's presence, Glass remarked that in light of the impending call, he would take the phone out right after the call, when he needed to leave the facility anyway and go to Eastern. Id.

88.  At 11:30 a.m. on August 3, Hill's office was hot, probably 85 degrees. Id. at 122.

89.  The conference call concerned the treatment plan which Central NY had promised for Ashcroft. Id. at 122.

90.  The plan had not been timely developed. Id.

91.  Within five minutes of the call starting close to noon, Glass fell asleep. Id. at 123-24.

92.  Before this date, on "multiple" occasions, plaintiff had fallen asleep at work, in the presence of the members of the treatment team, including Banyon, Loarca and Depew. Id. at 196-97.

93.  Hill knew Glass had to be at ECF by 1:00 p.m. and delayed starting the call because he did not want Glass participating in it.  Id. at 124.

94.  Before the call started, Hill would not make eye contact with Glass. Id. at 125.

95.  Glass suffers from severe sleep apnea, a fact known to Depew and Hill before August 3, 2004. Id. at 125, 127, Depew at 23-25 (spoke with Glass about sleep apnea and told Hill about it before August 3), Loarca at 28 (Glass mentioned problem to him before August 3) and 29 (Loarca discussed Glass' sleeping with Depew before August 3).

96.  Before August 3, when Depew told Hill that Glass fell asleep all the time, Hill did not respond to her. See, Depew at 25.

97.  Depew discussed Glass' sleep apnea with Hill at least five times before August 3, 2004. See, Depew at 27.

98.  Hill attended morning meetings where Glass fell asleep. See, Depew at 28-29.

99.  Depew never documented any of these incidents because she and Glass had a "very good working relationship" See, Depew at 26, and because it was Hill's job to document the issue and

did not do so. Id. at 30.

100.  Hill told Depew that he was not documenting Glass' episodes of sleep apnea because "Larry was at the beginning of his orientation and he wanted to give him a chance." Id. at 31.

101.  In deposition, Hill falsely denied he had ever witnessed Glass fall asleep before August 3, 2004, that anyone ever discussed this with him or that he had any awareness of the issue before Glass fell asleep during the August 3 conference call. See, Hill at 55-57, 95-96.

102.  Before August 3, 2004, Glass had fallen asleep at other meetings attended by Hill, Depew and other team members.  See, Glass at 137.

103.  Before firing Glass, Smith was told by Wright that Glass alleged that he had sleep apnea See, Smith at 35-36.

104.  After Glass fell asleep on August 3 after noon, he felt a sharp kick on his heel which pushed his left leg off of his right foot.  See, Glass at 129, 132-33.

105. Glass is a sound sleeper and believed that Hill kicked him very hard in order to awaken him. Id. at 133-34.

106.  Startled, Glass awoke to find Hill "leaning over [him] with a real angry look on his face." Id. at 129. [2]

107.  On top of Glass, a foot away, Hill remarked, "It's very rude to do this in a conference call." Id. at 131.

108.  Glass asked Shelly Depew, who was seated next to him, "What happened?"  She responded, "Mike didn't kick you that hard." Id. at 135. [3]

---

2  Hill denied that he was standing over Glass and claimed that he was seated when he tapped plaintiff.  See, Hill at 100-101.

3   Depew claims she told Glass, "You're sleeping again" and recalled no other comment she made to him. See, Depew at 54, 58.  Hill could not hear what Depew allegedly whispered, but when he returned to his office, she told him she  stated to Glass, "You were fucking asleep." See, Hill at 132-33.   Yet, in his account of the incident to his superiors written immediately after the occurrence, Hill claimed that Depew said to Glass that he was snoring audibly. See, Hill at 102.

109.  Concerned not to be late to ECF, Glass quickly left Hill's office bound for the elevator. Id. at 137.

110.  Hill followed right behind Glass, "in [my] footsteps."  When plaintiff turned around in the elevator, Hill was right in his face.  Glass felt Hill was going to swing at him. Hill stated, "I'm not sure we can work together anymore." Id. at 161, 185.

111.  Plaintiff then put one finger on Hill's chest and said, "Don't mess with me."  At that point, the elevator closed.  Id. at 137-38.

112.  Glass perceived Hill as angry about the comments he had made about Ashcroft.  Hill was pushing him away in a very personal manner. Id. at 138.

113.  Glass so concluded both because of Hill's sharp kick, pursuit and comment, but also because at about this time, Hill called plaintiff "a mental health liberal" in front of the entire staff. Id.  at 140.

114.  After the incident, Hill returned to his office and made a materially false claim to his staff - that Glass "kept poking" him in the chest. See, Depew at 59.

115.  Glass timely reported to ECF. Id. at 141.

116.  Glass told Rudder that he had almost quit that day. "He was fed up.  He was seriously thinking about quitting."  Glass did not go into details as to what had occurred. See, Rudder at 59.

117.  The next day, Hill told Rudder that he had almost fired Glass the day before and had just had a disagreement with Glass.  Rudder mentioned to Hill his conversation with Glass the prior day.  See, Rudder at 60.

118.  There was no exigent condition at ECF on the afternoon of August 3. See, Glass at 141,188-89.

119.  After Glass left SCF, Hill began an earnest and desperate campaign to discredit the plaintiff and protect or, as he put it, "defend" himself. See, Hill at 168-69.

120.  This campaign included numerous e-mails to CNYPC and the rallying of subordinates to assist him discredit Glass.

121.  In this regard, Hill admitted that on August 4, he asked his assistant, Depew, to contact all those who had worked with Glass and to gather any negative information they might have and ask them for memoranda concerning the same.  Id. at 166-67.

122.  According to Hill, he then would forward all this negative information to Lee and Sawyer as a means of defending himself. Id. at 168-69.

123.  In this context, at 12:31 p.m. on August 3, Hill reported to Lee and Sawyer [with a copy to his assistant  Depew] that Glass had "just walked out or [sic] Sullivan". [7]

124.  Hill wrote that could not guarantee that Glass would report to Eastern by 1:00 p.m.  Hill further provided his version of what happened: that after Glass had fallen asleep during the conference call, he had lightly tapped plaintiff with his [Hill's] recently repaired foot, that Glass stormed out of the room and that the men "met" at the elevator where Hill "pointed out that his falling asleep during the call was rude to the others of us" and that before he could say more, Glass poked him in the chest with his finger and accused Hill of kicking him in his bad leg in a manner which could have injured plaintiff.  See, Exhibit 12 to Sussman Affidavit.

125.  Hill falsely reported to Lee that there was "clinical situation/emergency" of which Glass was aware at Eastern then unfolding and raised concerns about who would cover for plaintiff if he did not show up at ECF. Id., Also see, Depew at 90 (unaware of any such exigent

---

7  As Director of Operations at Central New York Psychiatric Center [CNYCP], Sawyer provided supervision to the CNYPC satellite units and mental health units and various aspects of the inpatient treatment program. See, Sawyer Deposition at 7.  In the summer 2004, he reported to Hal Smith. Id. at 8.

circumstance at ECF).

126.  In his same initial report of this incident, Hill asked Dr. Lee for permission to approach another psychiatrist to replace plaintiff.  Id.

127. Sawyer, Hill's supervisor, could recall no response to Hill's e-mail. See, Sawyer deposition at 30-31.

128.  In fact, in response to Hill's e-mail, at 12:43 p.m. on August 3, Sawyer gave Hill permission to contact the community MD to assess interest in Glass' job.  Later that evening, Dr. Lee advised that she would be "MD shopping" the following day and promised to call Hill the following day "to come up with a plan." See, Exhibit 13 to Sussman Affirmation.

129.  On August 3, 2004,  Hill's secretary, Rampe prepared a memo citing an occasion where, she claimed, Glass had acted in a threatening manner toward her.  In her memo, Rampe did not state when this occurred or what she had done when it occurred. See, Exhibit 14 to Sussman Affirmation.

130.  Hill sent this document to Human Resources at NYCPC. Id., p. 2.

131.  When asked when this incident occurred, Hill did not know. See, Hill at 181.

132.  Hill also requested that his subordinates prepare their accounts of what happened during the morning conference call.  See, Loarca at        .

133.  In her report, Banyon relates that after Hill woke plaintiff, Depew said to Glass, "You're sleeping again." See, Exhibit 15 to Sussman Affirmation.

134.  After completing his work at ECF, Glass returned to SCF and filled out an accident report. Id. at 165, See, Exhibit 16 to Sussman Affirmation, which noted "kicked sharply in left leg by supervisor.  Pain shot up into groin and hip.  Total hip replacement 11/3, 2 groin surgeries past 7 months.".

135.  That night, Glass saw his urologist who found blood in his urine and noted Glass' complaint of severe groin pain, eventually diagnosed as a hernia. <u>See</u>, Glass at 145.

136.  For four months previous to Hill's kick, Glass did not experience such pain. <u>Id.</u> at 146.

137.  After examining him, Dr. Glass' urologist directed that he remain out of work until September 3. <u>Id.</u> at 146.

138.  At 6:47 p.m. on August 3, plaintiff sent Shelley Depew an e-mail indicating that Hill had injured him "when he kicked me that hard yesterday". <u>Id.</u> and Exhibit 17 to Sussman Affirmation.

139.  Depew shared the content of this e-mail with Hill. <u>See</u>, Depew at 119.

140.  At 7:27 pm, Glass wrote Hill, "you hurt me when you kicked me.  You kicked me as hard as you could.  Going to orthopedic surgeon tomorrow in city to make sure I just hurt and nothing happened to prosthesis.  Anger well exceeded the situation and felt more personal.  Will follow up after doctor's visit." <u>See</u>, Exhibit 18 to Sussman Affirmation.

**POST AUGUST 3 EVENTS**

141.  Early in the morning on August 4, Glass called the facility to report he could not be coming to work because of the pain associated with Hill's kick.  He spoke with Rampe who advised Depew, Hill's assistant. <u>See</u>, Exhibit 56 [tape recording of Rampe interview with Wright].  This was the second notice Glass provided that he would not be at work on August 4 due to the August 3 kick. <u>See</u>, Exhibit 18 for first notice.

142.  Glass also spoke directly with Depew and advised her that he had been kicked very hard and had pain in his groin and blood in his urine. <u>See</u>, Depew at 106.

143.  Despite this notice, Hill told Ronald Wright during an interview within the following ten days that Glass failed to advise the facility that he would not be at work **on August 4.** <u>See</u>,

Wright at 70-71**.**

144.   When asked whether he concluded that Hill's claim that he did not know Glass would be out on August 4 was a lie, Wright testified that he "didn't put it together.  I didn't see that." Id. at 92-93.

145.   The following day, in light of Hill's comment that he was not sure whether he could work with plaintiff anymore, Glass called defendant Hal Smith, who he had known for two decades. Id. at 161. [8]

146.   He recounted his experience with Hill of August 3 and indicated he did not want to be fired.  Smith responded, "You will not get fired.  We will find you another job." Id. at 161, 190-91. [9]

147.   According to Smith, following his call with Glass, during which he first learned of any issue arising between plaintiff and Hill the day before, he asked Wright to investigate several issues arising from the August 3 events: did Hill kick Glass inordinately hard and cause damages? Were there any witnesses? Was Dr. Glass asleep?  Was it Glass's habit to sleep on the job?  What, in fact, was Dr. Glass' performance? See, Smith at 26.  Smith assumed that Dr. Sawyer was present when he asked Wright to investigate these issues. Id.

148.   On August 4, plaintiff filed an assault charge against Hill at the Village of Fallsburgh Police Department. See, Glass at 165.

149.   At 8:22 am, in receipt of Glass' e-mail from the prior evening, Hill wrote Glass back, disagreeing with his account of what had occurred, particularly the force of his "kick" and

---

[8]  Consistent with his effort to distance himself from these events, Smith falsely testified that he barely knew the plaintiff and had minimal interactions with him before April 2004, when Glass was hired. See, Smith at 17-18.

[9]  Smith's account of the conversation is quite briefer: Glass merely reported that Hill kicked him sharply and he promised to insure an investigation into the event. See, Smith at 21-23.

claiming that the other three professionals [all subordinates of his] witnessed a much softer, gentler "tap". See, Exhibit 19 to Sussman Affirmation.

150.  Four minutes after writing this e-mail, Hill wrote Ron Wright, CNYPC's personnel administrator, Lee and Sawyer, noting that he already had asked for statements from Depew, Banyon, Loarca and Rampe. See, Exhibit 20 to Sussman Affirmation [10], Wright deposition at 8. [11]

151.  The same day, Smith, Sawyer, Wright and Hill asked staff to provide all e-mails sent from Glass. See, Depew at 111.

152.  Dr. Sawyer approved Hill's solicitation of statements from his own subordinates but advised that they needed to go directly to personnel from those writing them, in sealed envelopes. See, Exhibit 21 to Sussman Affirmation,

153.  At 11:39 am on August 4, Rudder, who had generally failed to cooperate with Glass at ECF, e-mailed Depew, Hill's Assistant, complaining [falsely] that plaintiff had left client charts unsecured on August 3.  See, Exhibit 22 to Sussman Affirmation. [12]

154.  Before sending this e-mail, Rudder had asked Depew what had transpired the day before and knew that Glass had accused Hill of assaulting him. See, Rudder at 70-71.

155.  At 12:23 on August 4, Hill advised Sawyer, Lee, Stevenson, and Wright that he had the

[10]  Sawyer knew that Hill asked his staff members to write these statements. See, Sawyer deposition at 40. Depew told Loarca that he "needed to write a statement." See, Loarca at 38.

[11]  Wright reported to Richard Stevenson, Director of Administration, who, in turn, reported to defendant Smith. See, Wright deposition at 10-11.

[12]  Rudder testified that Glass left charts in an unlocked drawer at the nurses' station which caused him to have to transport them back to the administrative offices, a task that exacerbated *his* arthritis. See, Rudder at 67-68.  Indeed, according to Loarca, no such group meeting, as Hill reported, occurred. See, Loarca at 41.

four <u>witness</u> statements in sealed envelopes being mailed to Wright's attention and then falsely claimed, "The staff have approached me as a group and as individuals <u>and, given the events of yesterday and a multitude of lesser events preceding this, expressed a concern about his [plaintiff's] return to Sullivan.  My opinion, independent of the other staff, is that Dr. Glass should not be returned to SCF and be placed on leave and subsequently prob'd [probationed] out at the appropriate point...He has alienated every member of the staff...I will be here until 4p.m. today if dialogue is required</u>." <u>See</u>, Exhibit 23 to Sussman Affirmation [emphases supplied]. [9]

156.  According to Wright, he received this e-mail from Hill, but, during his investigation, never asked any member of the Mental Health unit whether this was a true and accurate depiction of what had occurred. <u>See</u>, Wright at 97-98.

157.  Asked why he did not find out whether this represented the actual view of the staff or Hill's exaggerations intended to prejudice Glass, Wright stated, "The focus on my investigation was on the incident of August 3rd." <u>See</u>, Wright at 98.

158.  In fact, Hill's representation was an outright and baseless fabrication intended to cause plaintiff's termination.

159.  With respect to Rudder, at ECF, upon his hiring, Depew told him to report any concerns about Glass to her in writing. <u>See</u>, Depew 88-89.

160.  Yet until after Glass spoke out against Hill, triggering the incident of August 3, Rudder never sent a single report critical of Glass.  <u>See</u>, Depew at 112-114.

161.  Rudder denied making any negative comments about Glass to either Hill or Depew. <u>See</u>, Rudder at 83.

---

9  During his investigation, Wright spoke with Loarca who indicated he had no problem working with Glass. <u>See</u>, Wright at 72.

162.  Likewise, Hill never asked Loarca if he was alienated from Glass. See, Hill at 150.

163.  Hill never asked Depew that question. Id.

164.  Indeed, Hill admitted that he never asked any staff member that question. Id. at 150-51.

165.  Wright agreed that Hill was lobbying to get rid of Glass, whether by 4 August or sometime shortly thereafter. See, Wright at 99.

166.  In fact, as of August 3, Loarca worked very closely with Glass and never had any problem with him. See, Loarca at 27.

167.  Loarca never told Hill that he did not want Glass to return to SCF. Id.

168.  Loarca never told him or anyone that he felt alienated from Glass. Id. at 28.

169.  From Hill's e-mails, Sawyer concluded that Hill wanted Glass fired because "plaintiff was not fitting well into the organization". See, Sawyer deposition at 39.

170.  Wright knew even before he started his investigation that Hill wanted Glass fired. See, Wright at 76-77.

171.  Contrary to Hill's fabrications, plaintiff has positive relationships with 95% of the staff with whom he worked. Id. at 158, 198-99, Loarca at 30 [never saw plaintiff lose his temper with any member of the staff].

172.  Within forty minutes of receiving Hill's request that plaintiff be terminated, Sawyer replied that "at this time there are no plans to place Dr. Glass on leave, and his position about yesterday's interaction is quite different."  Sawyer directed Hill to desist from unwitnessed contact with plaintiff. See, Exhibit 24 to Sussman Affirmation.

173.  Within thirty minutes, Hill wrote Sawyer and Lee as follows: "both Katie Rampe and Diane have just approached me and informed me that they are fearful [really] about working in proximity to Dr. Glass...both has had experiences in the past few weeks where he has displayed a

"temper" that has them both very uneasy.  Just so you know that we have been making daily

accommodations for his behavior and antics...the bubble has burst." <u>See</u>, Exhibit 25 to Sussman

Affirmation. [10]

174.  Once, jokingly, Glass told secretary Rampe that "I've never yet him a woman," a comment

intended to convey that he was no threat whatsoever to her. <u>Id.</u> at 176.

175.  After plaintiff made this comment, Rampe did tell Depew she was afraid of the plaintiff.

<u>See</u>, Depew at 69-70.

176.  This happened about one month before August 3, 2004. <u>Id.</u>

177.  Depew told Rampe to let her know if she had any further problems with Glass.  <u>Id.</u>

178.  Rampe never again complained to Depew about Glass. <u>Id.</u> at 71.

179.  To Depew's knowledge, Rampe did not complain contemporaneously to Hill about Glass.

<u>Id.</u> at 71-72.

180.  Loarca never heard Rampe indicate that she was fearful of Glass. <u>See</u>, Loarca at 31-32.

181.  Nor did he observe any problem between Glass and Banyon, the unit's nurse practitioner.

<u>Id.</u> at 34.

182.  Likewise, Depew witnessed Glass and Banyon working together and Banyon never asked

for Depew's assistance with respect to Glass.  <u>See</u>, Depew at 44-45.

183.  Depew never heard Glass and Banyon argue. <u>Id.</u> at 46.

184.  Hill himself never received any request from Banyon to desist or change her working

relationship with plaintiff.

185.  In conducting his investigation, Wright never asked Banyon or Rampe whether they were

_____

[10]  Sawyer did not know if the two cited employees, allegedly threatened by Glass at some
undisclosed prior time, had reported their fears then to their superior. <u>See</u>, Sawyer deposition at
42.

fearful of working around Glass, as Hill represented. See, Wright at 101.

186.   A minute later after forwarding this false e-mail, Hill sent Sawyer a copy of a message complaining about Glass from Rudder.   See, Exhibit 26 to Sussman Affirmation, with the false message, "add this to the pile...unsolicited from Eastern." Id.   This latter phrase is belied by Hill's admissions that he asked Depew to contact staff and solicit any negative information possible about Glass. See, Hill at 166-67.

187.   A second memo from Rudder to Hill at 2:28 p.m. written the same day, in which Rudder writes to "Mike - just went through folders from Larry yesterday [I have been doing this from 1 PM].  I have multiple problems/questions, will send separate e-mail"  See, Exhibit 27 to Sussman Affirmation, confirms that Rudder was operating under the direction to find and report whatever dirt he could on Glass.

188.   In response to his receipt of Exhibit 25 in which Hill reported the allegedly fearful feelings of Rampe and Banyon, Sawyer replied, "Unfortunately, there were not previously documented, or were they?" See, Exhibit 28 to Sussman Affirmation.

189. Wright, too, was concerned that Glass' file had no reference to any prior performance problem. See, Wright at 79-80.

190.   In reply, Hill admitted that any such staff complaints had not been documented and then referenced his own meeting with Glass on August 2, 2004, which, he claimed, related to "his [Glass'] adversarial nature with the treatment team that was displayed at the morning meeting [Monday]...when I was not present." See, Exhibit 29 to Sussman Affirmation.

191.   After Hill reported to Lee and Sawyer that two female staff were afraid to work with Glass, Lee called him and they agreed that Glass was to be asked to account for things about which he theretofore had been given latitude. See, Exhibit 30 to Sussman Affirmation.

192.   Sawyer replied, cautioning Hill, while showing prejudgment against Glass, "Mike, it goes without saying that he should not have ever been given the latitude to arrive later, taken an hour walk, display hostility toward other team members, etc.  Until Ron [Wright] has an opportunity to conduct an on-site review, you will need to check with him prior to any interventions with Dr. Glass given he alleges transpired yesterday."  See, Exhibit 31 to Sussman Affirmation. [1]

193.  Through the afternoon of August 4, Hill continued to bombard CNYPC with negative e-mails about Glass. See, Exhibits 32-34.

194.  Hill highlighted to Sawyer, Lee and Wright the allegation that Glass had made errors at ECF which Rudder had to correct.  He explicitly represented to CNYPC that Rudder was researching and documenting plaintiff's alleged failures while totally unaware of any problem between Hill and Glass. See, Exhibit 35 to Sussman Affirmation.

195.  This statement was false as Hill told Wright during the latter's interview of him that on August 3, he had asked Depew to call Rudder and let him know what was happening so he, Rudder, could assist in arranging coverage while Glass was out.  See, Exhibit 56 to Sussman Affirmation, Wright at 95.  This, too, as shown above, was a half-truth.

196.  On August 5, 2004, Hill continued to badmouth Glass in an effort to distract attention from his own retaliatory motives. That day, he e-mailed a message to Wright, Lee and Sawyer which states as follows: "It was brought to my attention today that Dr. Glass had a cell phone in his office 8/3.  The phone was found by our lobby officer on his desk.  Dr. Glass openly displayed the phone to Shelly and Cesar, stating words to the effect, "I guess I should have this in here."

_____

[1]  According to Sawyer, he asked Wright into the matter because "[t]here was a negative interaction between two employees and I wanted him to look at that situation." See, Sawyer Deposition at 33.  Sawyer elaborated, "I asked our personnel director to conduct a review of the situation and to arrive at an objective representation of the facts so that *he* could decide what would be the appropriate course of action." See, Sawyer deposition at 41.

<u>See</u>, Exhibit 36 to Sussman Affirmation. [12]

197.  The same mail continued, "I am not inclined to sit back and let Dr. G muster an attack on me.  I would like to file disciplinary charges for his: sleeping on duty; abruptly walking out of a [high acuity case] conference call; having a cell phone within the secure perimeter; poking me in the chest with his finger." <u>Id.</u> [13]

198.   Disciplinary charges are not brought against probationary employees; they are either terminated for inadequate performance or made permanent. <u>See</u>, Smith at 50.

199.  Again, as with prior e-mails, Hill distorted prior events in a manner suggesting his retaliatory animus against plaintiff.

200.  In response to these e-mails from Hill, on August 5, 2004, Sawyer wrote Hill [copying Wright and Lee], "I need to be clear.  Ron Wright/Personnel will conduct an investigation <u>and make a determination</u> regarding what actions are appropriate in this case.  <u>You should not be involved in this process at this time...</u>" <u>See</u>, Exhibit 37 to Sussman Affirmation [emphases supplied].

201. Sawyer promised that Wright would begin his investigation on August 9, the following Monday.  <u>Id.</u>

202.  Within two minutes of sending this e-mail, Sawyer advised Wright as follows, "Dr. G apparently told Pam Carrier today that he is considering filing charges against Mike [Hill] (assault?).  Ron [Wright], this case will likely require quicker attention than the Clinton situation." <u>See</u>, Exhibit 38 to Sussman Affirmation.

202.  In response to Sawyer's direction that Hill "not be involved in this process at this time," at

---

2[2]  Smith claimed that he did not want Hill doing the investigation since he, Hill, was a potential target of the investigation. <u>See</u>, Smith at 41.

3[3]  Smith admits he knew that Hill did not want Glass to remain at SCF.  <u>See</u>, Smith at 43.

4:22 p.m. on August 5, Hill wrote Sawyer requesting "a quick investigation...the scope of his [Glass'] mis-doings (cell phone - clinician orders)...are increasing". See, Exhibit 39 to Sussman Affirmation.

203.  Sawyer responded "Understood. Ron will make this a priority." Id.

204.  On August 6, 2004, the same day she received medical documentation taking plaintiff out of work until September 3, 2004 on worker compensation, Depew, Hill's assistant, wrote Glass a memo documenting alleged errors on orders for inmates at Eastern.  See, Exhibits 40 and 41 to Sussman Affirmation.

205.  On August 6, 2004, Depew wrote Hill a memo documenting Glass' possession of a cell phone on August 3. See, Exhibit 42 to Sussman Affirmation.

206.  Hill immediately forwarded Depew's memo to Sawyer, Hill & Wright. See, Exhibit 43 to Sussman Affirmation,

207.  On August 6, 2004, Hill wrote Wright, Lee & Sawyer claiming that Glass' "errors" are mounting as time goes on rather than wane..." See, Exhibit 44 to Sussman Affirmation.  Of course, at this time, Glass was on medical leave.

208.  On August 9, 2004, Hill continued with his false memoranda, writing Wright [on the day he had been told Wright was instituting his investigation] that Glass had failed to bring in medical notes documenting that he had a tear in his groin and blood in his urine as a consequence of Hill's kicking him. Cf, Exhibit 45 to Sussman Affirmation with Exhibit 40.

219.  As of August 11, 2004, Smith believed that Glass had provided CNYPC with medical documentation excusing him from work into November 2004. See, Exhibit 46 to Sussman Affirmation from Smith to Wright, et al., 8/11/04 at 4:26:58.

210.  Wright corrected this early the next morning, Thursday, August 12, noting in an e-mail to

Smith, Hill and others that, "[T]he medical I have shows that Dr. Glass has restrictions through 9/3...from what I have seen, he may be able to come back sooner.  His limitations may not preclude him from working at all right now.  Will let you know." See, Exhibit 47 to Sussman Affirmation.

## WRIGHT'S INVESTIGATION

211.  Wright had conducted personnel investigations for one or another state agency for more than 20 years. See, Wright deposition at 11-12.  Hill asked Sawyer, his supervisor, to assign Wright to conduct this investigation.

212.  By early August 13, 2004, Wright advised Lee and Sawyer that he had completed his investigation into "the incident that allegedly occurred between Mike Hill and Dr. Glass on August 3" and credited Hill's account of what occurred. See, Exhibit 47 to Sussman Affirmation.

213.  At the time he made this finding, Wright was aware that Glass had objected to the gassing of Ashcroft and disputed Hill's handling of that matter. See, Wright at 82-83.  See, Exhibit 57 to Sussman Affirmation for tape-recording of Wright interview with Hill.

214.  As of August 13, 2004, Wright had never met with Glass. See, Wright deposition at 14.

215.  In an e-mail dated August 13, 2004, Wright identified the following issues...which warrant closer review"[.] Id. {emphasis supplied]:

1.  Numerous medication errors - Wright claimed that he "asked for specific details." Id.[14]

2.  Plaintiff took a cell phone into SCF in violation of DOC's rules.

3.  Dr. Glass made an implied threat to punch the unit secretary at SCF.

---

[4][14]  At deposition, Wright stated that he asked either Banyon or Depew for details of these alleged medication errors, but received **no response**.  See, Wright at 54-56.  When he received no response to his e-mail request for such information, Wright did not call either woman for more details. Id. at 56.  According to Loarca, Glass medicated his patients with no issues. See, Loarca at 36-37.

4.  Dr. Glass left patient charts unattended in an unsecured area. [15]

5.  Dr. Glass made inappropriate physical contact with Hill on 8/3.

6.  Staff have expressed concern about working with Dr. Glass who has displayed temper.

216.  Wright never discussed any of these issues with Glass. See, Wright at 46, 51, 57.

217.  After writing this e-mail, Wright was not asked to pursue any of these issues any further.

See, Wright at 62.

218.  Wright did not speak with Loarca about any of these issues. See, Loarca at 41.

219.  Wright interviewed Banyon and Depew together but never discussed any of these issues.

See, Depew at 18.

220.   With regard to the first identified issue, at ECF, nurses were tasked with reviewing scripts

to insure all information was accurate. See, O'Connor at 25-27.

221.  When nurse O'Connor advised Glass of minor deficiencies in scripts, he made all needed

changes. Id. at 27.

222.  O'Connor had no problems with Glass and had a cordial professional relationship with

him. Id. at 27, 35.

223.  Had she believed a psychiatrist was not doing his/her job, she would have reported that to

her supervisor.  She had no such occasion with Glass. Id. at 40.

224.  With regard to the second issue, Wright saw an e-mail from Depew who claims that Glass

showed her a cell phone at work on August 3, that she told him to walk it to the car and that he

did not do so.  She further admits that she did nothing to report this event on that day and made

---

5[5]  As part of his investigation, Wright never reviewed any patient charts. See, Wright at 48.  His
investigative file contains e-mails from Rudder complaining about Glass' practices at ECF.  But,
Wright did not even know what facility the complaints related to and did nothing to investigate
the veracity of these complaints. See, Wright at 49-51.  The materials in Wright's file came from
Hill, with whom Wright could not recall speaking about any "medication error" issue.

no mention of it until after the altercation between Hill and plaintiff. <u>See</u>, Depew at 72-77.

225. After she learned of Hill's campaign against Glass, her superior asked her to write the matter up. <u>See</u>, Depew at 77.

226.  With regard to (4) above, Wright did not know which facility this allegedly happened at, never discussed the matter with Glass and could not recall any source for his information.  <u>Id.</u> at 57-58.

227. Wright had no recollection of any discussion with Hill, who he believed to be Glass' supervisor, about this issue. <u>Id.</u> at 58-59.

228.  In fact, Depew knew that Glass left inmate patient charts at the nurses' station so that ECF nurses could transcribe script orders and get them filled. <u>See</u>, Depew at 108.

229.  With regard to issue 5 above, Wright interviewed Banyon and Depew, two person who were in the conference call when Hill returned.  He did not ask either of them, or Rampe, the unit secretary, whether Hill told them that Glass had poked him in the chest at the elevator. <u>See</u>, Wright at 63-64.

230.  Wright also never confronted Glass with that accusation. <u>Id.</u> at 64.

231.  Hill's strong desire to be rid of Glass was a factor influencing Wright's recommendation: "I couldn't say that there wasn't an obvious attempt to influence the outcome." <u>See</u>, Wright at 108.

231.  Before his termination, Glass spoken with Wright once; initiated by Glass, Wright summarized the 10-15 minute conversation in contemporaneous notes, which are undated. <u>See</u>, Exhibit 51, Wright deposition at 15, 24-26.  302.  During the investigation initiated by Wright on or about August 9, 2004 incidents, Wright never contacted plaintiff for an interview. <u>Id.</u> at 187. Nor did Wright ask Glass for a statement concerning any of the issues under review. <u>Id.</u> at 187-

88.

232.  During this conversation, Wright did not ask Glass any questions about the six issues he found needed more investigation. Id.

233.  Glass sent Wright no e-mails.

234.  In investigating the events of August 3, Wright traveled from Marcy to Sullivan County to speak with witnesses identified by Hill. See, Wright at 18.

235.  Wright never interviewed Rudder. See, Rudder at 82-83.

236.  According to Smith, Wright did not conduct any investigation concerning patient care issues, which were outside of his expertise. See, Smith at 62.

237.  Glass advised Wright that Hill's kick caused him to seek and have rendered medical care. See, Exhibit 51.

238.  During his investigation, Wright received from Glass medical documentation showing his reporting of the incident on the date it occurred and the result of plaintiff's medical visit of August 6, a determination that he was totally disabled through September 3, 2004. See, Wright at 28-35.

239.  When Wright interviewed Hill in Sullivan County during his investigation, he learned that Hill and Glass had disputes about the Ashcroft case and that these underlay the events of August 3.  However, Wright chose not to "actively pursue the Ashcroft part of the disagreement.  That wasn't the focus of [his] investigation." See, Wright at 35-36.

240.  During his investigation, Wright interviewed Kathy Rampe. He tape-recorded that interview.

241.  On said recording, Ms. Rampe laughed when discussing the alleged threat made by plaintiff  against her and makes clear she never took such a "threat" seriously or so reported any

such threat. <u>See</u> Exhibit 56 for tape-recording of interview.

242.   Indeed, according to her, Glass was in her area, asking Depew to accompany him on rounds in SHU when she, Rampe, jokingly teased him, asking "How many psychiatrists does it take to do rounds?"  Rampe laughingly claimed that Glass became angry and showed her his fist and then said, I've never hit a woman yet."  Rampe did not report this incident to anyone at the time and Depew, who she identified on the tape as Glass' supervisor, was present when it occurred. <u>Id.</u>  [18]  Wright never determined when this incident occurred. <u>See</u>, Wright at 46.

**<u>PLAINTIFF'S TERMINATION</u>**

243.   According to Wright, by August 13, he had discussed his report with Smith who "agreed to termination on probation if we [Lee, Sawyer and he]  reach that conclusion."

244.   By 8:45 am on August 16, Lee wrote Hill with a plan for covering SCF and ECF. <u>See</u> Exhibit 48 to Sussman Affirmation.

245.   At 8:51 am, Sawyer wrote Hill, "[S]eems like the Glass thing is coming to an end, thankfully." <u>See</u>, Exhibit 49 to Sussman Affirmation.

246.   At 8:51 a.m. Sawyer replied to Wright's memorandum of August 13, thanking him for handling "this" so fast. <u>See</u>, Exhibit 50 to Sussman Affirmation.

247.   According to Wright, after the August 16, 2004 cabinet meeting, he, Sawyer and perhaps Lee met to "discuss the findings of the investigation." <u>See</u>, Wright at 66.  [16]  Hal Smith was not at this meeting. <u>Id.</u>

---

[8]  Wright did not speak with Depew or anyone else about this incident during his investigation. <u>See</u>, Wright at 45-46.  In deposition, Wright stated with respect to this matter, "To the best of my knowledge, I don't recall ever pursuing that." <u>Id.</u> at 46.

[6]  Wright had no notes of any such meeting, could not recall how long it lasted and could not remember any details of the meeting other than the agreement to terminate Glass. <u>See</u>, Wright at 66.  He recalled no question either Sawyer or Lee asked at the meeting nor anything he said beyond what was in his August 13, 2004 e-mail. <u>Id</u> at 66-67.

248.  Sawyer denied being part of ANY discussion concerning whether or not to terminate Glass, but, rather, learned about the decision after it was made. See, Sawyer Deposition at 28-29.

249.  Sawyer claims to have had no input into the decision to terminate plaintiff. Id.[17]

250.  Instead, on or about August 5, Sawyer left for Florida for a week to ten days and "had little involvement in what transpired with respect to Dr. Glass." See, Sawyer deposition at 48.

251. When asked what "little involvement" he had, Sawyer stated, "[N]one that I can recall." Id. at 49.

252.  According to Sawyer, those involved in the decision to terminate plaintiff were Wright, Lee, Hill and Smith. Id. at 29.

253.  After the meeting with Sawyer, which Sawyer denies being present for, Wright did not brief Smith, who had to make the decision to terminate plaintiff.  He does not know who briefed Smith. See, Wright at 68.

254.  Smith initially claimed that Wright briefed him, Sawyer and Lee in a meeting where they discussed Wright's summary findings. See, Smith at 37.

255.  However, after giving this testimony, Smith changed his account, claiming that he was out of the facility for approximately six weeks starting on July 7, 2004 for back surgery and that he left Sawyer in charge of the facility. See. Smith at 38.

256.  Still later, Smith could not remember whether he met with Sawyer, Lee and Wright or whether they had a conference call concerning Wright's report. See, Smith at 55.

257.  Still later, after claiming several times that he met with staff together to discuss Wright's findings, Smith claimed he was not sure whether he spoke with his senior staff together or individually about Wright's report and how to proceed with plaintiff. See, Smith at 56.

---

[17] When pressed as to his own role in the termination, Sawyer had "no specific recollection." See, Sawyer deposition at 44.

258.  Later, Smith acknowledged he did not have any distinct memory of the process leading to Glass' termination, "just the outcome."  <u>Id.</u>

259.  When shown an e-mail that suggested that Sawyer, Lee and Wright were to meet and discuss how to handle plaintiff's complaint on August 16 and then report to him, Smith could not recall if that had happened. <u>See</u>, Smith at 76-77.

260.  Smith testified that Glass was terminated because "the body of information that came to our attention pointed to conclusive facts that continuing Dr. Glass' employment may be a detriment to patients and would not benefit CNYPC." <u>See</u>, Smith at 83.

261.  Smith claimed that he did not care whether Hill wanted Glass back at SCF or not; when asked whether he considered Hill's attitude in deciding to terminate plaintiff, again Smith changed his story, now claiming it was not the "sole" factor in his action. <u>See</u>, Smith 100-101.

262. According to Smith, Lee never told him that she had spoken with Glass about any issue relating to his termination. <u>Id.</u> at 104.

263.  Smith had no idea whether Wright had spoken with Glass during his investigation.  <u>See</u>, Smith at 47.

264  Smith did not learn that during his investigation, Wright had confirmed that immediately after Hill kicked plaintiff, Glass had blood in his urine. <u>See</u>, Smith at73.

265.  When shown Wright's report and directed to the section which indicated that further review was needed with regard to six issues concerning plaintiff's performance, Smith did not know whether any further review of these issues occurred, who, if anyone, did that review or whether anyone discussed these issues with plaintiff. <u>Id.</u> at 57.

266.  When asked about the claim that Glass committed numerous medication errors, Smith claimed that he had general conversation, which he could not recall, with Sawyer and Lee, about

this subject. See, Smith at 78.  When asked whether either told him Glass had wrongly medicated an inmate, Smith replied, "I do not recall the specific medication errors." Id.

267.  When asked about the allegation that Glass had a cell phone in the facility, Smith stated, "That was reported to me by Mike Hill, but I don't know that I or anyone else pursued it to prove or disprove it." See, Smith at 79.

268.  When asked about Wright's suggestion that Glass had made "an implied threat" to punch the unit secretary at SCF, Smith did not know what this even meant and had no information concerning this issue. See, Smith at 79.

269.  When asked about the claim that Glass left patient charts in an unsecured area, Smith had no information about that. Id.

270.  When asked about the claim that Glass poked Hill in the chest, Smith erroneously claimed that this "occurred in front of witnesses", though he did not recall if mention of this was made in any witness reports. See, Smith at 80.

271.  With regard to the last point Wright raised - that staff were afraid of working with Glass - Smith claims to have relied on what Sawyer and Lee told him, though "I don't know what [information] they had." Id..

272.  According to Smith, Lee and Sawyer told him that "a number of staff" had raised concerned about Glass, but Smith did not know which staff did so. See, Smith at 81.

273.  Smith claimed that Glass worked closely with Hill [who plaintiff rarely saw], Depew [with whom he had a positive relationship] and Rampe, [who he had little to do with]. Cf. Smith at 82 with Glass Affidavit.

274.  Smith did not know of Glass' working relationship with Loarca, with whom he had more collaboration that any other SCF staff member. Cf., Smith at 82 with Glass Affidavit.

275.  According to Smith, Wright told him that termination of Glass would be justified based on the findings in his report; when asked which findings Wright claimed justified termination, Smith answered, "I really don't remember." <u>See</u>, Smith at 58.

276.  As noted above, Wright denied having any conversation with Smith about his report, but claimed to have briefed others - Smith's direct reports - including Sawyer.  Sawyer denied participating in any way in discussions concerning terminating Glass.  Smith claimed that Sawyer did discuss these issues with him. See, Smith at 59.

277.  According to Smith, "it was Dr. Sawyer's opinion that continuing to retain Dr. Glass may be to the detriment of patients and was certainly compromised by his relationships or lack of relationships with many of the staff." See, Smith at 59.

278.  According to Smith, Sawyer had spoken with SCF staff before making these representations to him.  Sawyer denied making any such statements or having anything to do with staff.

279.  According to Smith, Sawyer advised him that Glass had failed to complete certain medical charting in a timely manner and had inadequate progress notes.  See, Smith at 60-61.

280.  Smith never saw any of the charts, did not know when the problem was discovered, did not know if anyone discussed the problem with Glass nor how many patients were involved. Id. at 61.

281.   Smith acknowledged that OMH employed Donna Lamb as director of quality management but that he never asked her to review any of Glass' files to assess their compliance with state standards. <u>See</u>, Smith at 65.

282.   Routinely, New York State audits a sampling of psychiatrists' charts; Smith never received any adverse information about Glass' work through this process, <u>See</u>, Smith at 67.

283.  Smith could not remember even considering asking Lamb or state audit to review Glass' files to determine whether there was any problem. Id. at 68.

284.  Smith was concerned that Hill had "no personal vendetta or interest in advancing anything other than legitimate interests of my organization."   He considered whether Hill was orchestrating a campaign against Glass for his own reasons. See, Smith at 68.

285.  Smith claims to have had phone contact with Hill as Wright conducted his investigation and to have advised Hill "to distance himself from this." Id. at 70.

286.  According to defendant Smith, as Executive Director of NYCPC, he was not contemporaneously  advised of the problems with Ashcroft nor of Glass' disagreements concerning the case with Hill.   See, Hill Deposition at 7, 11-13.

287.  According to Smith, sometime later, in the fall 2004, Lee advised him that Glass "raised issues" about the case. Id. at 13-15.

288.  Later, during his deposition, Smith contradicted himself, claiming that in late August 2004, he learned that Glass and Hill disagreed about the propriety of Ashcroft's placement at the Marcy facility through the 2PC process. See, Smith 93, ll. 4-18, , 96, 11-17.

289.  Smith learned this information from Dr. Lee or Dr. Sawyer, but did nothing to find out whether Glass had been pressured to sign the 2 PC.  Id. at 97.

290.  On August 16, Wright signed a letter terminating Glass.

291.  After learning he had been terminated, Glass called and asked Smith why he had been fired. Smith said, "Well, they are talking about prescriptions at Eastern.  They are talking about mistakes you made on the medication."  Glass replied, "That's bullshit.  That's not true.  I might have left somebody's birth date out but I didn't make medication errors".   Smith then accused Glass of alienating the entire staff.  Glass replied, "Who did you listen to?  Who are you talking

to?"  Smith replied, "Larry, I'm tired of your bullshit.  Fuck you," and then hung up the phone.

Id. at 191-92. [20]  Also see, Glass at 204-05 regarding "false" accusation that he mis-prescribed

medications at Eastern.

## POST-TERMINATION EVENTS

292.  Under his collective bargaining agreement, Glass had the right to a post-termination

meeting to plead for his job. Id. at 193, Wright at 74.

293.  On September 7, 2004, Glass met with Stevenson and Wright to discuss his termination. [19]

Wright made notes of that conversation. See, Exhibit 52 to Sussman Affirmation.

294.  At this meeting, Glass did 99% of the talking, Wright and Stevenson [from OMH's HR

Department] "weren't really listening...it was just that they were going through the motions and

things were already decided." Id. at 194.

295.  Wright's notes reflect that, at this meeting in early September 2004,, Glass explained the

genesis of Hill's anger as relating to plaintiff's opposition to Hill's treatment of Ashcroft.  Id. at

2, 5-7.

296.  After this meeting, Wright recommended to Smith that the termination be sustained. See,

Exhibit 53 to Sussman Affirmation.

297.  Smith assented and, on September 15, 2004, Wright confirmed that Glass' probationary

service was terminated and the matter closed. See, Exhibit 54 to Sussman Affirmation.

298.  Despite initial contravention by OMH, the State of New York Workers' Compensation

Board awarded plaintiff coverage and compensation for "a work related injury - exacerbation of

groin injury and depression." See, Exhibit 55 to Sussman Affirmation.

---

[20]  According to Smith, he ended his conversation with Glass with these words, "Larry, you're
being fucking unprofessional.  We have nothing further to say."  See, Smith at 85.

[19]  Wright had recommended Glass' termination. See, Wright at 75.

299.  Normally, Wright is consulted concerning the contravention of such claims and he learned that the State Insurance Fund, acting on behalf of OMH, had ceased controverting Glass' claim. He took no action thereafter to question this decision. <u>See</u>, Wright at 106-07.

300.  For his part, Smith, the executive director of the agency, claimed to know nothing about plaintiff's worker compensation claim, the agency position on his claim or its disposition.  <u>See</u>, Smith at 74.

301.  Hill testified at the worker compensation hearing against the grant of Glass' disability. <u>See</u>, Hill at 118.